# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FONTAINE L. BAKER, SR.,

            Plaintiff,

v.

PAUL KEMPER, KRISTIN VASQUEZ, LAURA FRAZIER, MICHAEL HAGEN, KERI NACKER, JENNIFER BAAS, PAMELA FLANNERY-COOK, GARRETT GROW, TRAVIS BRADY, JORI BISHOP, MARCELO CASTILLO, MORGAN DIX, JASON MOORE, and JENNIFER THOMAS,

            Defendants.

Case No. 17-CV-1275-JPS

**ORDER**

**1.**     **INTRODUCTION**

On December 4, 2017, the Court screened Plaintiff's initial complaint. (Docket #11). Plaintiff alleged that Defendants participated in various ways in denying him medication for his post-traumatic stress disorder ("PTSD"). *Id.* at 3–7. The Court allowed Plaintiff to proceed on two claims: 1) deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, and 2) medical malpractice claims against each of the medical Defendants. *Id.* at 7–10. Plaintiff later amended his complaint to withdraw the medical malpractice claim. (Docket #17).

All Defendants save Pamela Flannery-Cook ("Flannery-Cook") are represented by the Wisconsin Department of Justice (hereinafter the "State Defendants"). Flannery-Cook has her own private counsel. Each set of defendants filed a motion for summary judgment on August 1, 2018. (State

Defendants' motion, Docket #38; Flannery-Cook's motion, Docket #44). The motions are now fully briefed, and for the reasons explained below, they must be granted.

2. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

3. **BACKGROUND**

   3.1 **Defendants' Theories for Dismissal**

All Defendants save Paul Kemper ("Kemper") assert that Plaintiff's claim should be dismissed because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). If a prisoner fails to exhaust his administrative remedies as to a particular claim, the Court must dismiss the claim without reaching its merits. *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). Kemper contests the merits of Plaintiff's claim, maintaining that he was not deliberately indifferent to Plaintiff's medical needs. The Court begins by addressing a few preliminary matters, and then proceeds to discuss the facts relevant to each of Defendants' arguments.

### 3.2 Exhaustion of Prisoner Administrative Remedies

It is helpful to review how the PLRA's exhaustion requirement plays out in the Wisconsin prison system prior to relating the relevant facts. The PLRA establishes that, prior to filing a lawsuit complaining about prison conditions, a prisoner must exhaust "such administrative remedies as are available[.]" 42 U.S.C. § 1997e(a). To do so, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require," and he must do so precisely in accordance with those rules; substantial compliance does not satisfy the PLRA. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *Smith v. Zachary*, 255 F.3d 446, 452 (7th Cir. 2001); *Burrell v. Powers*, 431 F.3d 282, 284–85 (7th Cir. 2005). Several important policy goals animate the exhaustion requirement, including restricting frivolous claims, giving prison officials the opportunity to address situations internally, giving the parties the opportunity to develop the factual record, and reducing the scope of litigation. *Smith v. Zachary*, 255 F.3d 446, 450–51 (7th Cir. 2001).

Failure to exhaust administrative remedies is an affirmative defense to be proven by Defendants. *Westefer v. Snyder*, 422 F.3d 570, 577 (7th Cir. 2005). Exhaustion is a precondition to suit; a prisoner cannot file an action prior to exhausting his administrative remedies or in anticipation that they will soon be exhausted. *Hernandez v. Dart*, 814 F.3d 836, 841–42 (7th Cir. 2016); *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A lawsuit must be dismissed even if the prisoner exhausts his administrative remedies during its pendency. *Ford*, 362 F.3d at 398.

The Wisconsin Department of Corrections ("DOC") maintains an Inmate Complaint Review System ("ICRS") to provide a forum for administrative complaints. Wis. Admin. Code DOC § 310.04. There are two

steps an inmate must take to exhaust their administrative remedies under the ICRS. First, the inmate must file a complaint with the Institution Complaint Examiner ("ICE") within fourteen days of the events giving rise to the complaint. *Id.* §§ 310.07(1), 310.09(6). A complaint filed beyond that time may be accepted by the ICE, in their discretion, if the inmate shows good cause. *Id.* § 310.07(2). The inmate is required to expressly seek leave to file a late complaint and provide reasons for their tardiness. *Id.*

The ICE may reject a complaint or, before accepting it, can direct the inmate to "attempt to resolve the issue." *See id.* §§ 310.08; 310.09(4); 310.11(5). If the complaint is rejected, the inmate may appeal the rejection to the appropriate reviewing authority. *Id.* § 310.11(6). If the complaint is not rejected, the ICE issues a recommendation for disposing of the complaint, either dismissal or affirmance, to the reviewing authority. *Id.* §§ 310.07(2), 310.11.1 The reviewing authority may accept or reject the ICE's recommendation. Id. at § 310.07(3).

Second, if the ICE recommends dismissal and the reviewing authority accepts it, the inmate may appeal the decision to the Corrections Complaint Examiner ("CCE"). *Id.* §§ 310.07(6), 310.13. The CCE issues a recommendation to the Secretary of the Department of Corrections who may accept or reject it. *Id.* §§ 310.07(7), 310.13, 310.14. Upon receiving the Secretary's decision, or after forty-five days from the date the Secretary received the recommendation, the inmate's administrative remedies are exhausted. *Id.* §§ 310.07(7), 310.14.

### 3.3 Plaintiff's Failure to Dispute Most of the Material Facts

The relevant facts are largely undisputed because Plaintiff failed to properly dispute them. In the Court's scheduling order, entered January 4, 2018, Plaintiff was warned about the requirements for opposing a motion

for summary judgment. (Docket #18 at 3–4). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. In Defendants' motions for summary judgment, they too warned Plaintiff about the requirements for a response as set forth in Federal and Local Rules 56. (Docket #38 and #44). Plaintiff was provided with additional copies of those Rules along with the motions. *Id.* In connection with their motions, Defendants filed supporting statements of material facts that complied with the applicable procedural rules. (Docket #40 and #48). The statements contained short, numbered paragraphs concisely stating those facts which Defendants proposed to be beyond dispute, with supporting citations to the attached evidentiary materials. *See id.*

Plaintiff's responses to Defendants' statements of fact, as well as his own proposed statements of fact, are almost entirely devoid of references to evidence. *See, e.g.*, (Docket #53). Rather, he simply states his disagreement with the proposed fact (or his qualified agreement) in prose form without citation to the record. *Id.* Plaintiff did provide some evidence in the form of a ten-page affidavit and almost 250 pages of documents. (Docket #55 and #55-1). Again, however, this information is largely unconnected with Plaintiff's actual responses to the statements of fact. This error is magnified by the fact that some of the factual responses *are* accompanied by citations to evidence. *See* (Docket #54 at 2–3). Thus, Plaintiff's failure to cite evidence for each of his purported disputes was a deliberate choice on his part (even if motivated by nothing more than laziness).

Despite being twice warned of the strictures of summary judgment procedure, Plaintiff ignored those rules by failing to properly connect his

disputes or statements of fact with citations to relevant, admissible evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. Put another way, Plaintiff cannot foist his responsibility to cite evidence onto the Court's shoulders. Thus, the Court will, unless otherwise stated, deem the majority of Defendants' facts undisputed for purposes of deciding their motions for summary judgment. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants). Only those few facts which are accompanied by a citation to evidence will be assessed at all. This does not, of course, mean that such statements will constitute a proper dispute or statement of the proposed fact, but they will at least be considered by the Court.

### 3.4 Relevant Facts

#### 3.4.1 Overview of Events

As to the majority of Defendants, the merits of Plaintiff's claims are not at issue in this Order. Thus, the Court provides only a brief discussion of the conduct underlying this action. At all times relevant, Plaintiff was incarcerated at Racine Correctional Institution ("RCI"). Kemper is RCI's warden, and the other Defendants are doctors, nurses, and guards.

On October 5, 2016, Plaintiff attempted to retrieve his medication from Defendant Jason Moore ("Moore"). Moore initially gave Plaintiff the wrong medication. When Plaintiff pointed this out, Moore looked at Plaintiff's medication sheet and noted that Plaintiff should not be receiving any medications. The medications had apparently been stopped by Plaintiff's doctor, who believed that Plaintiff was being non-compliant with

his course of medical treatment. Plaintiff disputes that he was noncompliant. In any event, Moore sent him away empty-handed. Over the remainder of October 2016, Plaintiff then repeatedly complained to the other Defendants that he needed medical attention and the resumption of his medications, but they were either slow to respond or entirely nonresponsive. Eventually, Plaintiff was seen by a doctor on November 9, 2016, and his prescriptions were resumed.

Plaintiff contends that all Defendants except Kemper were deliberately indifferent to his PTSD, depression, and insomnia because they failed to remedy his lack of medication. He also alleges that some of the defendant correctional officers made false entries in his medical records. As to Kemper, Plaintiff maintains that his policy of allowing guards to distribute medication and make medical file notations, rather than medical staff, exhibited deliberate indifference.

### 3.4.2 Plaintiff's Inmate Complaints

Plaintiff has filed numerous inmate complaints and is familiar with the ICRS process. He filed two such complaints with respect to the events of this case, both on November 27, 2016. In the first, RCI-2016-26906 ("26906"), Plaintiff complained that on October 5, 2016, he was given the wrong medication by a correctional officer. Plaintiff refused to take the medication, but the officer did not then supply the allegedly correct prescription. The ICE rejected the complaint as untimely without considering its merits. 26906 was submitted fifty days after the date of the incident. Plaintiff tried to explain his delay by claiming that he had only recently learned that his constitutional rights had been violated. The ICE was apparently unmoved. Two days later, the ICE met with Plaintiff and

confirmed that he had been provided his medication since the beginning of November.

The second complaint, RCI-2016-26913 ("26913"), alleged that the staff of the Health Services Unit ("HSU") and Psychological Services Unit ("PSU") were ignoring Plaintiff's medical conditions by abruptly discontinuing his PTSD medication. In 26913, Plaintiff said that the issue began on October 5 and continued through October 27 or November 9, 2016 (it is not entirely clear), and that various guards and medical staff failed to respond to his requests for treatment.

As with 26906, the ICE rejected 26913 as untimely, being submitted fifty-three days after the date of the incident. The ICE further noted that the complaint came eighteen days after the issues were resolved; Plaintiff met with a doctor on November 9, 2016 and was given new prescriptions. And as before, the November 29, 2016 meeting confirmed that Plaintiff had been provided with his medication since the beginning of November. The ICE also checked with the HSU Manager, Defendant Laura Frazier ("Frazier"), about Plaintiff's concerns.[1]

### 3.4.3 Medication Distribution Policy

Plaintiff wrote to Kemper on November 16 and 21, 2016, outlining his complaints with how his medication issues were being handled. Plaintiff wrote again on December 9, 2016, wherein he specifically stated that correctional officers should not be handling his medications or medical records. Kemper delegated the investigation into Plaintiff's complaints to Frazier. He did not view Plaintiff's complaints as emergent, as they related

---

[1] Plaintiff filed another complaint around this time, RCI-2016-27117, but he admits that it is not relevant to the claims in this case. (Docket #53 ¶ 35).

to issues which arose two months prior. Kemper did write a curt response to Plaintiff thanking Plaintiff for sharing his opinion. (Docket #55-1 at 37).

At most Wisconsin prisons, including RCI, the medication distribution policy allows correctional officers to deliver most medications directly to inmates. This excludes narcotic pain medication which is handled by the nursing staff. Inmates who are in the general population can receive their medications in a designated area in their unit, while those in segregation are given the pills directly at their cell.

Psychotropic medications are distributed by officers to ensure that the medicine is taken, avoid overdosing, and to limit the inmates' ability to sell the prescribed medications to other prisoners. These medications come in blister packs. DOC policy directs that when delivering medication, officers must compare the label on the blister pack to the relevant medical record, to confirm that the correct medicine is being given to the correct inmate at the proper time and in the right dosage. If the officer finds a discrepancy between the medical record and the medication label, they must contact a nurse before dispensing the pills.

Once the officer confirms that the information is consistent between the record and the pack, the inmate is allowed to view the medication label to verify the officer's conclusion. Medication is only dispensed once both parties have agreed that the information is correct. The officer then records whether the inmate took the medication, refused it, or was otherwise unable to take it during the medication pass. No inmate can be forced to take medication, and so a refusal is simply noted in the medical record.

HSU is likewise responsible for ensuring that the medication labels and medical record match for each prescription. HSU also educates prisoners on the medical aspects of their medications, as well as the names,

dosages, and times for taking those medications. The correctional officers receive training on medication delivery both before they begin working, and annually while employed. In addition to the DOC's medication policies, each institution's inmate handbook describes the medication delivery process.

A "medication occurrence" happens when medication is dispensed inappropriately. HSU is required to document medication occurrences. Correctional staff must report such occurrences to HSU staff, who then complete the necessary paperwork to document the event.

4. ANALYSIS

   4.1 Failure to Exhaust Administrative Remedies

The failure to follow the procedural rules of a prison's grievance process constitutes a failure to exhaust administrative remedies. Or, more precisely, a failure to *properly* exhaust administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). Here, both of Plaintiff's relevant inmate complaints were rejected by the ICE as untimely. A rejected inmate complaint does not achieve exhaustion, as it means that the prisoner failed to follow all steps in the grievance process. *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005); *Edmonson v. McCaughtry*, 157 F. App'x 908, 910 (7th Cir. 2005). Thus, Plaintiff's administrative remedies remain unexhausted and he cannot proceed on his claims against all Defendants save Kemper.

Plaintiff offers a number of arguments as to why the ICE should have excused his tardiness, but they are not persuasive. He says the delay in filing was due to his attempted compliance with RCI's informal resolution requirement. The RCI inmate handbook states that inmates are "expected" to attempt to resolve their issues informally before filing a formal ICRS complaint. (Docket #42-3 at 8). The handbook further states that if "the issue

remains unresolved, [the inmate] can file a complaint[.]" *Id.* at 9. Plaintiff explains that he proceeded through this informal resolution process from the date of the incident, October 5, through November 22, 2016. Only after the process was completed did he file his formal complaint.

Plaintiff's argument fails to account for what was actually included in his inmate complaints. In 26906, he listed the "date of incident" as October 5, 2016. He cannot fault the ICE, then, for using that date to assess timeliness. Plaintiff later supplemented 26906 to state, among other things, that the "date of incident" spanned from October 5 to November 9, 2016. Even calculated from November 9, Plaintiff's complaint was still late. In both his initial complaint and his appeal of the ICE's rejection of the complaint, Plaintiff's primary excuse for lateness was that he had only recently been told by a jailhouse lawyer that his rights may have been violated. He also mentioned that he had been in segregation and not "in my right state of mind." (Docket #41-2 at 12).

In 26913, Plaintiff did not mention any excuse for his tardiness. Instead, he listed the "date of incident" as October 5 through November 22, 2016. But in the "details" section of the complaint, the final date he mentioned was November 9, 2016. This makes sense, as November 9 was the day that Plaintiff's prescriptions were resumed. In his appeal of the rejection of 26913, Plaintiff again states that he filed the complaint after being given legal advice, and that "this is a health and safety issue that is ex[e]mpt from the time limit." (Docket #41-3 at 13).

At no point in either complaint or appeal did Plaintiff explain that he was late because he was busy completing the informal resolution process. "This Court cannot second-guess the reviewing authority as to the application of the ICRS's procedural rules," and certainly will not do so for

remains unresolved, [the inmate] can file a complaint[.]" *Id.* at 9. Plaintiff explains that he proceeded through this informal resolution process from the date of the incident, October 5, through November 22, 2016. Only after the process was completed did he file his formal complaint.

Plaintiff's argument fails to account for what was actually included in his inmate complaints. In 26906, he listed the "date of incident" as October 5, 2016. He cannot fault the ICE, then, for using that date to assess timeliness. Plaintiff later supplemented 26906 to state, among other things, that the "date of incident" spanned from October 5 to November 9, 2016. Even calculated from November 9, Plaintiff's complaint was still late. In both his initial complaint and his appeal of the ICE's rejection of the complaint, Plaintiff's primary excuse for lateness was that he had only recently been told by a jailhouse lawyer that his rights may have been violated. He also mentioned that he had been in segregation and not "in my right state of mind." (Docket #41-2 at 12).

In 26913, Plaintiff did not mention any excuse for his tardiness. Instead, he listed the "date of incident" as October 5 through November 22, 2016. But in the "details" section of the complaint, the final date he mentioned was November 9, 2016. This makes sense, as November 9 was the day that Plaintiff's prescriptions were resumed. In his appeal of the rejection of 26913, Plaintiff again states that he filed the complaint after being given legal advice, and that "this is a health and safety issue that is ex[e]mpt from the time limit." (Docket #41-3 at 13).

At no point in either complaint or appeal did Plaintiff explain that he was late because he was busy completing the informal resolution process. "This Court cannot second-guess the reviewing authority as to the application of the ICRS's procedural rules," and certainly will not do so for

reasons which were not presented to the ICE in accordance with those procedural rules. *Vanpietersom v. Peterson*, Case No. 18-CV-60-JPS, 2018 WL 4178182, at *3 (E.D. Wis. Aug. 30, 2018); *See Lindell v. O'Donnell*, No. 05-C-04-C, 2005 WL 2740999, at *17 (W.D. Wis. Oct. 21, 2005) ("This court cannot re-examine [procedural] defaults and second-guess the application of state procedures by state agencies and courts. For that reason, when the record of an inmate's use of the prison complaint system arrives in federal court, it is what it is."); *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004) (dismissal of prisoner grievance for procedural reasons gives rise to procedural default, which "blocks later attempts to litigate the merits"). Because Plaintiff did not cite the informal resolution process to the ICE as a basis for good cause to accept his late complaints, this Court cannot now consider that position.

Plaintiff further argues that November 22, 2016 should be used as the last "date of incident" for his complaints, because that is when he completed the informal resolution process. The Court cannot accept this reasoning. Complaints, and their associated "date of incident," relate to the underlying issue the inmate presents, such as an instance of excessive force, failure to provide medical care, or the like. The informal resolution process is not part of the "incident" and so cannot be counted to extend the time for filing an ICRS complaint. To find otherwise would gut the timeliness requirement entirely; an inmate would be free to decide when he believed the informal process had been completed, and then file his complaint, even if this were months or years after the incident. In any event, the ICE knew all of this at the time she rejected Plaintiff's complaints. This Court cannot second-guess her decision.

Fundamentally, any attempt to avoid the time limit based on the informal resolution process is contrary to the plain language of the RCI inmate handbook. As noted above, the handbook directs inmates to follow the informal process before submitting a formal complaint. However, it then reiterates that complaints "must be filed within 14 calendar days of the original incident date." (Docket #42-3 at 9). Critically, the handbook explains that "[i]f you were directed by the ICE office to contact staff about your issue, and do not receive a response, contact the ICE within fourteen calendar days of the date of incident/denial or as directed by the ICE office." *Id.* Thus, the handbook confirms that, regardless of the status of an inmate's informal resolution process, they are required to begin the formal process within fourteen days. Plaintiff did not do so.

Finally, Plaintiff contends that in his November 29, 2016 meeting with the ICE, she invited him to file his complaints out-of-time. But this cannot be true; the ICE promptly *rejected* the complaints for being untimely. To the extent there is a dispute about the content of their conversation, the written record is clear: Plaintiff failed to timely file his complaints, his assertions of good cause for his tardiness were rejected, and the additional arguments regarding good cause that he now offers in his legal briefs were not presented to the ICE. Thus, Plaintiff has failed to exhaust his administrative remedies and all Defendants save for Kemper are entitled to summary judgment on that basis.

### 4.2    Medication Distribution Policy

The Eighth Amendment entitles prisoners to adequate medical care. A prison official violates this entitlement when they exhibit deliberate indifference to an inmate's medical needs. Ordinarily, to establish a violation of an inmate's right to medical care, they must show that: 1) the

inmate had a serious medical condition, 2) the prison official was deliberately indifferent to addressing the condition, and 3) the official's indifference caused the inmate some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Applying those elements to Kemper in this case, Plaintiff must show that Kemper was deliberately indifferent to the dangers posed by the policy of having correctional officers distribute medications.

Deliberate indifference is an exceedingly high level of culpability. Negligence, even gross negligence, is not enough. *Id.* Rather, "deliberate indifference is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Id.* (quotation omitted). Showing deliberate indifference requires proof that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and proof that the official actually drew that inference. *Id.* (quotation omitted).

Kemper's conduct falls far short of deliberate indifference to a risk of serious harm to Plaintiff. Detailed policies exist to control how correctional officers go about distributing medication. Their conduct is overseen by the medical staff, who are also responsible for checking forms and educating inmates about their medications. Finally, the inmates themselves have a say in their medications; no inmate is forced to take any medication, and they are permitted to check the medication labels to ensure that they are receiving the correct medicines.

The central bases of Plaintiff's claim against Kemper are the interaction on October 5, 2016, and the allegation that certain Defendants made erroneous notations in his medical file. Absent evidence of consistent danger to Plaintiff from the medications policies, these few mistakes cannot

support Kemper's liability in this case. *See Richmond v. Dart*, Case No. 12-C-0954, 2012 WL 567245, at *2 (N.D. Ill. Feb. 17, 2012) (isolated errors in medication distribution, though potentially harmful, cannot support constitutional liability, and collecting cases in agreement). This assumes that Plaintiff has any evidence of actual incorrect notations in his medical file, which is not clear from the record.

Further, Plaintiff did not notify Kemper of these issues until well after they had been resolved. By that time, Kemper could no longer do anything directly to alleviate Plaintiff's concerns. Instead, he directed Frazier to investigate Plaintiff's allegations. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (wardens can delegate tasks to medical personnel where appropriate, because "[t]he division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively").

In sum, even though distribution of medication by correctional officers may not be ideal, Plaintiff has failed to raise a triable issue as to whether Kemper was deliberately indifferent to a serious risk of harm posed by the relevant policies. Kemper is, therefore, entitled to summary judgment.

5.  **MOTION FOR APPOINTMENT OF COUNSEL**

Prior to Defendants' summary judgment filings, Plaintiff submitted his third motion for appointment of counsel. (Docket #36). It is substantively identical to his two previous such motions. *Compare* (Docket #13 and #34) *with* (Docket #36). For the reasons previously explained, the Court continues to conclude that appointment of counsel is not necessary in this case. *See* (Docket #17 and #35).

This conclusion is not altered by the fact that this case has reached the summary judgment stage.[2] Plaintiff has shown that he was able to gather some evidence via discovery requests and present cogent arguments in his briefs. The fact that he did not present his evidence in the proper manner—by appropriately responding to Defendants' statements of fact—was due to his own willful flaunting of the procedural rules. Additionally, unless appointed counsel possessed a time machine, they could do nothing to help Plaintiff remedy his failure to exhaust his administrative remedies. Finally, even with help from a lawyer, it seems clear that no construction of the record evidence would result in constitutional liability for Kemper for the medication distribution policy. Thus, the Court will deny Plaintiff's third motion for appointment of counsel.

6. **CONCLUSION**

The bulk of Plaintiff's claims must be dismissed because he failed to properly exhaust his administrative remedies. Those claims will be dismissed without prejudice.[3] Plaintiff's sole remaining claim against Kemper fails because he has not shown that Kemper was deliberately indifferent to a risk of harm posed by using correctional officers to dispense medication. That claim will be dismissed with prejudice. With all of the claims disposed, the Court will close this case.

---

[2]The Court of Appeals directs district courts to be mindful of the advancing stages of litigation when considering counsel appointment. *McCaa v. Hamilton*, 893 F.3d 1027, 1032 (7th Cir. 2018). But if, as here, Plaintiff repeatedly submits form motions which contain no argument about any newfound difficulties based on the stage of the case, this Court should bear no obligation to consider the issue. The Court has nevertheless generously done so here; it does not alter the result.

[3]Although it seems unlikely that Plaintiff will be able to complete the ICRS process for his claim at this late date, dismissals for failure to exhaust are always without prejudice. *Ford*, 362 F.3d at 401.

Accordingly,

**IT IS ORDERED** that Plaintiff's third motion for appointment of counsel (Docket #36) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motions for summary judgment (Docket #38 and #44) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants Kristin Vasquez, Laura Frazier, Michael Hagen, Keri Nacker, Jennifer Baas, Pamela Flannery-Cook, Garrett Grow, Travis Brady, Jori Bishop, Marcelo Castillo, Morgan Dix, Jason Moore, and Jennifer Thomas be and the same are hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Plaintiff's claim against Defendant Paul Kemper be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of March, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge